*Maryland Department of Health v. Shawn Orland Myers, Jr., et al.,* Nos. 1901, 2074, 2150, 2162, 2163, 2280, 2281, 2283, 2284, 2286, 2287, 2288, 2289, 2290, September Term, 2022.  Opinion by Graeff, J.

**CONSTRUCTIVE CIVIL CONTEMPT — STATUTORY SANCTIONS — DUE PROCESS**

Where the court finds an individual to be incompetent to stand trial ("IST") and dangerous and commits the individual to the Maryland Department of Health (the "Department") with an order to admit the defendant to a designated health facility within 10 business days, and the Department does not admit the defendant to a Department facility within that time period, there are two ways to attempt to compel compliance.  First, a party can file an action for constructive civil contempt.  Second, a party can file an action for statutory sanctions under Md. Code Ann., Criminal Procedure ("CP") § 3-106(c)(4) (2023 Supp.).

To find a violation of CP § 3-106(c)(2) and impose sanctions under CP § 3-106(c)(4), the court needs to find only that the Department failed to admit an individual deemed IST and dangerous to a designated health facility within the statutorily required 10-day period.  A finding that the Department acted willfully or had the present ability to comply with the commitment order is not required.  If the court finds a failure to timely admit a defendant, the statute provides for the imposition of sanctions "reasonably designed to compel compliance."  In Mr. Myers' case, the court did not abuse its discretion in finding that a sanction of $1,000 a day satisfied that standard.  In Mr. Murphy's case, the court imposed a sanction to reimburse the detention center for the cost to house Mr. Murphy, but because there was no evidence supporting the sanction amount, imposition of the sanction was improper.

In either a contempt or statutory enforcement action, the Department must be given notice of the claim and an opportunity to be heard before a court may impose sanctions for failure to timely place a defendant in a Department facility.  Because the orders in the 12 Baltimore City cases violate the Department's due process rights, we reverse those judgments.

Circuit Court for Anne Arundel County
Case Nos. C-02-CR-17-001144, C-02-CR-21-001095

Circuit Court for Baltimore City
Case Nos. 122118030, 122301016, 122279008,
121175003, 122118017-018, 122143007,
121084024, 122025004, 822321005,
119217014, 119217016, 822178008,
122153030, 116356007, 121280006

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

Nos. 1901, 2074, 2150, 2162, 2163, 2280, 2281,
2283, 2284, 2286, 2287, 2288, 2289, 2290
September Term, 2022

---

MARYLAND DEPARTMENT OF HEALTH

v.

SHAWN ORLAND MYERS, JR., ET AL

---

Wells, C.J.,
Graeff,
McDonald, Robert N.
(Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Graeff, J.

_____

Filed: February 29, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This case involves what appears to be a recurring problem, where individuals who have committed a crime and been found incompetent to stand trial ("IST") and dangerous due to a mental disorder are committed to a mental health facility designated by the Maryland Department of Health (the "Department"), but they remain in detention centers due to the Department's inability to place them in designated health care facilities within the 10-day time limit required by statute. The Maryland appellate courts previously have addressed claims relating to this problem. *See Powell v. Md. Dep't of Health,* 455 Md. 520 (2017); *State v. Crawford*, 239 Md. App. 84, 119 (2018).

In this consolidated appeal, the Department, appellant, challenges 14 separate orders that were issued due to its failure to timely admit defendants who had been found IST and dangerous to a psychiatric facility. Two orders were issued by the Circuit Court for Anne Arundel County, which found the Department, and several of its officials, in constructive civil contempt for the failure to comply with court orders to admit Shawn Orland Myers, Jr., and Zachary Murphy, appellees, respectively, to a psychiatric facility operated by the Department within the 10-day time frame required by statute. The court imposed sanctions for contempt, as well as statutorily-authorized sanctions.

The Department also challenges 12 orders issued by the Circuit Court for Baltimore City, ordering it to reimburse the Maryland Department of Public Safety and Correctional Services ("DPSCS") for operating costs at the rate of $166 per day for its failure to admit 12 individuals (appellees or "Baltimore City Defendants"), who had been found to be IST and dangerous and committed to a Department facility. The court found that DPSCS was entitled to reimbursement because the Department did not admit the Baltimore City

Defendants to a Department facility within the 10-day period required by statute, and appellees remained in jail.

On appeal, appellant presents the following questions, which we have rephrased slightly, for this Court's review:

1. Did the Circuit Court for Anne Arundel County lack jurisdiction, improperly hold the Department in contempt, and impose sanctions where proper service was not effected?

2. Did the Circuit Court for Anne Arundel County abuse its discretion in finding the Department in constructive civil contempt and imposing sanctions?

3. Did the Circuit Court for Baltimore City commit multiple abuses of discretion when, without giving the Department notice, the opportunity to offer opposition, or the opportunity to offer evidence that its orders would compel compliance, the court ordered the Department to reimburse costs?

For the reasons set forth below, we shall reverse in part, affirm in part, and vacate in part, the judgments of the Circuit Court for Anne Arundel County, and we shall reverse the judgments of the Circuit Court for Baltimore City.

**COMPETENCY AND COMMITMENT PROCEDURES**

We begin by summarizing the procedures governing competency evaluations and commitment orders. The State may not proceed with a criminal prosecution "against a defendant who is not competent to stand trial." *Powell,* 455 Md. at 527. A defendant found incompetent to stand trial may not be detained "unless the government is taking steps to provide treatment to restore the defendant to competence or to have the defendant civilly committed." *Id.* The trial court determines "whether a defendant is competent, is

2

dangerous to self or others, and, if incompetent, has the potential to be restored to competence." *Id.* As we previously explained:

> A person is "not competent to stand trial" if he or she is unable "(1) to understand the nature or object of the proceeding; or (2) to assist in one's defense." Md. Code (2017 Supp.), § 3-101(f) of the Criminal Procedure Article ("CP"); *State v. Dixon*, 230 Md. App. 273, 282, 146 A.3d 1223 (2016). When a defendant "appears . . . to be incompetent," the court "shall determine, on evidence presented on the record," whether the defendant is "incompetent to stand trial" ("IST"). CP § 3-104. To aid in this determination, a court may "order the [Department] to examine the defendant," and it "shall set . . . the conditions under which the examination is to be made." CP § 3-105(a).
>
> A defendant may be "confined in a correctional facility until the [Department] can conduct the [competency] examination." CP § 3-105(c)(1). If, however, "the court finds that, because of the apparent severity of the mental disorder . . . , a defendant in custody would be endangered by confinement in a correction facility," the court may order that the Department confine the defendant at a "medical facility that the [Department] designates as appropriate" or "immediately conduct a competency examination of the defendant by a community forensic screening program or other agency that the [Department] finds appropriate." CP § 3-105[c](2)(i). *See Dixon*, 230 Md. App. at 285–87, 146 A.3d [at 1229–30] (Where a court determines that a defendant needs to be confined in a psychiatric facility for his own safety pending a competency evaluation, it may order that the Department admit the defendant to such a facility.). *Accord Powell*, 455 Md. at 529, 168 A.3d [at 863] (A trial court is "charged with determining whether a defendant is in fact incompetent to stand trial and, if so, what to do about it.").

*Crawford*, 239 Md. App. at 91–92.

Section 3-106(c) of the Criminal Procedure Article governs the process for committing a defendant to one of the Department's designated health care facilities.[1] Md.

---

[1] A "designated health care facility" includes "a hospital or private residential facility under contract with the Health Department to house and treat individuals found to be incompetent to stand trial or not criminally responsible." Md. Code Ann., Criminal Procedure ("CP") § 3-106(a)(1)(iii) (2023 Supp.). It "does not include a correctional or detention facility or a unit within a correctional or detention facility." *Id.* § 3-106(a)(2).

Code Ann., Criminal Procedure ("CP") § 3-106(c) (2023 Supp.). It provides, in relevant part:

> (1) If, after a hearing, the court finds that the defendant is incompetent to stand trial and, because of mental retardation or a mental disorder, is a danger to self or the person or property of another, the court shall order the defendant committed to the facility that the Health Department designates until the court finds that:
>
> > 1. the defendant no longer is incompetent to stand trial;
> > 2. the defendant no longer is, because of mental retardation or a mental disorder, a danger to self or the person or property of others; or
> > 3. there is not a substantial likelihood that the defendant will become competent to stand trial in the foreseeable future.

In *Powell,* 455 Md. at 542–47, the Department failed to admit the appellants to a psychiatric hospital by the deadline set by the court in its commitment order. The Supreme Court held that the Department did not violate CP § 3-106 by failing to admit a criminal defendant by a deadline set in a commitment order because nothing in the statute "sets a deadline for admission, or authorizes the court to set one." *Id.* at 543.

In response to this decision, the General Assembly added a deadline for admission. *See* 2018 Md. Laws Ch. 189 (S.B. 233). The preamble to Senate Bill 233 explained the reasons for the deadline as follows: (1) "The unreasonable detention of defendants found incompetent to stand trial or not criminally responsible outside a treatment facility is a serious public safety risk and a violation of the U.S. Constitution;" (2) "Keeping potentially dangerous, seriously mentally ill defendants from treatment exacerbates their problems and violates their right to due process;" (3) "The crisis of delayed treatment for seriously mentally ill and incompetent defendants in Maryland has been foreseeable for many years and well-documented, facilitated by a steady reduction in capacity and staff of State

4

hospitals while the demand for forensic beds has remained constant;" and (4) "Seriously mentally ill and incompetent defendants will continue to be unlawfully housed in detention centers unless the courts have authority to impose deadlines to enforce court orders." *Id.*

Effective October 1, 2018, CP § 3-106(c) now provides:

> (2) If the court commits a defendant to the Health Department under paragraph (1) of this subsection, the Health Department shall:
>
> (i) admit the defendant to a designated health care facility as soon as possible, but *not later than 10 business days* after the Health Department receives the order of commitment; and
>
> (ii) notify the court of the date on which the defendant was admitted to the designated health care facility.
>
> \* \* \*
>
> (4) If the Health Department fails to admit a defendant to a designated health care facility within the time period specified in paragraph (2)(i) of this subsection, the court may impose any sanction reasonably designed to compel compliance, including requiring the Health Department to reimburse a detention facility for expenses and costs incurred in retaining the defendant beyond the time period specified in paragraph (2)(i) of this subsection at the daily rate specified in § 9-402(b) of the Correctional Services Article.[2]

§ 3-106(c) (emphasis added).

After a defendant is committed to a Department facility, the court is required to hold an annual hearing to determine if the defendant continues to meet the criteria for commitment. CP § 3-106(d); *Crawford,* 239 Md. App. at 93. Hearings are also required after a filing by the State's Attorney or defense counsel setting forth new facts or circumstances related to the competency determination, or after receiving a report from the Department with new information relevant to the determination. *See* CP § 3-106(d).

---

[2] The daily rate is currently at least $45 per day. *See infra* p. 65 n. 40.

There are several psychiatric hospitals in Maryland where defendants who are found IST are admitted for treatment and care. Clifton T. Perkins Hospital Center ("Perkins") is a maximum security facility for defendants charged with serious crimes. *Crawford*, 239 Md. App. at 93. The other four hospitals, Spring Grove Hospital Center, Springfield Hospital Center, Thomas B. Finan Center, and Eastern Shore Hospital Center, are regional facilities. *Id.* at 93 n.2.

We turn now to the specific facts and issues presented in this case.

## FACTUAL AND PROCEDURAL BACKGROUND

The contempt findings and imposition of sanctions at issue here were based on orders relating to each of the 14 appellees.[3] The circuit courts for Anne Arundel County and Baltimore City ordered that the appellees be committed to the Department based on a finding that the defendant was IST and dangerous to self or another. We summarize below the orders for each appellee.

---

[3] On March 20, 2023, this Court consolidated the cases of *Maryland Department of Health v. Shawn Orland Myers, Jr.*, No. 1901, Sept. Term, 2022 with *Maryland Department of Health v. State of Maryland*, No(s). 2074, 2150, 2162, Sept. Term, 2022; *Maryland Department of Health v. Latif Abdullah*, No. 2163, Sept. Term, 2022; *Maryland Department of Health v. Jermaine M. Sanders*, No. 2280, Sept. Term, 2022; *Maryland Department of Health v. Kavon Alston*, No. 2281, Sept. Term, 2022; *Maryland Department of Health v. Tijuan Swinson*, No. 2283, Sept. Term, 2022; *Maryland Department of Health v. Dominic Griffin*, No. 2284, Sept. Term, 2022; *Maryland Department of Health v. Antionne Johnson*, No. 2286, Sept. Term, 2022; *Maryland Department of Health v. Deonta Wilson*, No. 2287, Sept. Term, 2022; *Maryland Department of Health v. Kevin Mosely*, No. 2288, Sept. Term, 2022; *Maryland Department of Health v. Maria Gomez*, No. 2289, Sept. Term, 2022; *Maryland Department of Health v. Christopher Justin Straham*, No. 2290, Sept. Term, 2022.

6

# I.

## Individual Commitment Orders

### A.

### Anne Arundel County Circuit Court

Shawn Orland Myers, Jr., was charged with second-degree assault. On November 14, 2022, the court issued an order stating that, because Mr. Myers had been found IST and dangerous, he be committed to the Department for confinement until he was no longer IST. The court further ordered that the Department admit Mr. Myers to a designated health care facility within 10 business days after receipt of the commitment order. Mr. Myers was not admitted to a Department facility until January 5, 2023.

Zachary Murphy was charged with first-degree murder, theft of $1,500 to $25,000, and two counts of attempting to elude police by failing to stop. On November 21, 2022, the court issued an order stating that, because Mr. Murphy had been found IST and dangerous, he be committed to the Department for confinement until he was no longer IST. The court further ordered that the Department admit Mr. Murphy to a designated health care facility within 10 business days after receipt of the commitment order. Mr. Murphy was not admitted to a Department facility until January 29, 2023.

### B.

### Baltimore City Circuit Court

Latif Abdullah was charged with first-degree assault, second-degree assault, reckless endangerment, and theft. On November 16, 2022, the court found Mr. Abdullah IST and a danger to himself or others and committed him to the Department. It ordered

the Department to admit Mr. Abdullah to a designated health care facility no later than 10 business days after receipt of the order of commitment. On December 21, 2022, the court ordered the Department to reimburse the DPSCS at a rate of $166.00 per day for failure to admit Mr. Abdullah within 10 days of the commitment order. The sanction accrued from December 5, 2022, until January 20, 2023, when Mr. Abdullah was admitted to a Department facility.[4]

Kavon Alston was charged with third- and fourth-degree sexual offenses and second-degree assault. On January 18, 2023, the court found Mr. Alston to be IST and a danger to himself or others. It ordered that Mr. Alson be committed to the Department, and that the Department admit Mr. Alston to a designated health care facility no later than 10 business days after receipt of the commitment order. On February 8, 2023, the court ordered the Department to pay the DPSCS operating costs at the rate of $166 per day, beginning on February 1, 2023, until the defendant was admitted to a Department facility, based on its failure to timely admit the defendant to a Department facility.[5]

Maria Gomez was charged with crimes in three separate cases, involving charges of assault, attempted robbery, reckless endangerment, and child abuse. On December 14, 2022, the court found Ms. Gomez to be IST and a danger to herself or others. The court ordered that Ms. Gomez be committed to the Department, and that the Department admit

---

[4] The record includes only the orders by the court. The record before us does not contain a motion to sanction the Department; nor does it indicate how the judge became aware that the defendant was not admitted to a facility within 10 days.

[5] With the exception of Latif Abdullah, the records in the Baltimore City cases do not indicate when the defendants were admitted to a designated health care facility.

Ms. Gomez to a designated health care facility no later than 10 business days after receipt of the order of commitment. On January 11, 2023, the court ordered the Department to pay the DPSCS operating costs at the rate of $166 per day, beginning on December 30, 2022, until the defendant was admitted to a Department facility, based on its failure to timely admit the defendant to a Department facility.

Dominic Griffin was charged with sex abuse of a minor, second-degree child abuse, first- and second-degree assault, and sodomy. On January 4, 2023, the court found Mr. Griffin to be IST and a danger to himself or others. The court ordered that Mr. Griffin be committed to the Department, and that the Department admit him to a designated health care facility no later than 10 business days after receipt of the commitment order. On January 25, 2023, the court ordered the Department to pay the DPSCS operating costs at the rate of $166 per day, beginning on January 18, 2023, until the defendant was admitted to a Department facility, based on its failure to timely admit the defendant to a Department facility.

Bernard Hopkins was charged with attempted first- and second-degree murder, first-degree assault, and offenses related to the use of a firearm. On November 16, 2022, the court found Mr. Hopkins IST and a danger, and it committed him to the Department. The court ordered the Department to admit Mr. Hopkins to a designated health care facility no later than 10 business days after receipt of the commitment order. On December 21, 2022, the court ordered the Department to pay the DPSCS operating costs at the rate of $166 per day, beginning on December 5, 2022, until the defendant was admitted to a Department facility, based on its failure to timely admit the defendant to a Department facility.

9

Rashheeda Jackson was charged with first- and second-degree assault and a weapons offense. On November 16, 2022, the court found Mr. Jackson IST and a danger to himself or others. It committed him to the Department and ordered that the Department admit Mr. Jackson to a designated health care facility as soon as possible, but no later than 10 business days after receipt of the commitment order. On December 21, 2022, the court ordered the Department to pay the DPSCS operating costs at the rate of $166.00 per day, accruing from December 5, 2022, until the defendant was admitted to a Department facility, based on its failure to timely admit the defendant to a Department facility.

Antoinne Johnson was charged with attempted first- and second-degree murder, assault, and several related firearm offenses. On December 7, 2022, the court found Mr. Johnson to be IST and a danger to himself or others. The court ordered that Mr. Johnson be committed to the Department and admitted to a designated health care facility as soon as possible but no later than December 20, 2022, 10 business days after receipt of the commitment order. On January 11, 2023, the court ordered the Department to pay the DPSCS operating costs at the rate of $166.00 per day, accruing from December 21, 2022, until the defendant was admitted to a Department facility, based on its failure to timely admit the defendant to a Department facility.

Kevin Mosely was charged with attempted second-degree murder, first- and second-degree arson, assault, reckless endangerment, malicious destruction of property, and malicious burning. On December 14, 2022, the court found Mr. Mosely to be IST and a danger to himself or others. The court committed Mr. Mosely to the Department and ordered it to admit him to a designated health care facility as soon as possible but no later

10

than 10 days from receipt of the commitment order. On January 11, 2023, the court issued an order requiring the Department to pay the DPSCS operating costs at rate of $166.00, beginning on December 30, 2022, until the defendant was admitted to a Department facility, based on its failure to timely admit the defendant to a Department facility.

Jermaine Sanders was charged with criminal offenses in two separate cases involving charges of first-degree murder, second-degree assault of a law enforcement officer, and related offenses. On December 21, 2022, the court found Mr. Sanders to be IST and dangerous and committed him to the Department. It ordered the Department to admit Mr. Sanders to a designated health care facility no later than 10 business days after receipt of the commitment order. On January 11, 2023, the court ordered the Department to pay the DPSCS for operating costs at $166 per day until the defendant was admitted to a Department facility, based on its failure to timely admit the defendant to a Department facility.

Christopher Justin Straham was charged with first- and second-degree murder, first- and second-degree assault, armed robbery, robbery, theft, and possession of a dangerous weapon with intent to injure. On January 4, 2023, the court found Mr. Straham to be IST and dangerous and committed him to the Department. The court ordered that Mr. Straham be admitted to a designated health care facility no later than 10 business days after receipt of the order of commitment. On January 25, 2023, the court ordered the Department to pay the DPSCS operating costs at the rate of $166.00 per day until the defendant was admitted to a Department facility, based on its failure to timely admit the defendant to a Department facility.

11

Tijuan Swinson was charged with criminal offenses in two separate cases, including charges of armed robbery, second-degree assault, use of a deadly weapon, and reckless endangerment. On November 30, 2022, the court found Mr. Swinson IST, committing him to the Department and ordering that he be admitted to a health care facility within 10 days. On January 11, 2023, the court ordered the Department to pay the DPSCS operating costs at a rate of $166.00 per day until the defendant was admitted to a Department facility, based on its failure to timely admit the defendant to a Department facility.

Deonte Wilson was charged with second-degree assault, malicious destruction of property, and a weapons offense. On November 30, 2022, the court found Mr. Wilson to be IST, committed him to the Department, and ordered that the Department admit him to a designated health care facility as soon as possible, but no later than December 13, 2022, ten business days after receipt of the commitment order. On January 11, 2023, the court issued an order requiring the Department to pay the DPSCS operating costs at a rate of $166.00 per day, until the defendant was admitted to a Department facility, based on its failure to timely admit the defendant to a Department facility.

## II.

## Contempt Proceedings: Shawn Orland Myers, Jr.

## A.

## Petition for Contempt and Show Cause Order

On December 5, 2022, Shawn Orland Myers, Jr., filed a Petition for Constructive Civil Contempt and Request for Show Cause Order directing the Department and its officials — Robert R. Neall, Secretary, Maryland Department of Health, Lisa Burgess,

12

M.D., Acting Deputy Secretary for Behavioral Health Administration, and Michele Fleming, LCSW-C, Director, Centralized Admissions — to show cause why they should not be held in contempt for failure to comply with the November 14, 2022 commitment order directing the Department to admit Mr. Myers to a designated health care facility for evaluation and treatment no later than 10 business days from the date of the order. The petition alleged that it had been two years since the start of the COVID-19 pandemic, but "admission delays regularly continue to far exceed the 10-day statutory time frame." Mr. Myers had been awaiting admission for 22 days at the time he filed the petition, and he was being detained at the Anne Arundel Detention Center "experiencing severe difficulties." In addition to the issuance of a show cause order, Mr. Myers requested the court to issue an order providing for a hearing, requiring the Department to reimburse the Anne Arundel detention facility for expenses and costs incurred in retaining Mr. Myers beyond the statutorily prescribed 10-day period, directing the Department to immediately effect the transfer of Mr. Myers to a health care facility, and granting "such other and further relief as the nature of the cause requires." Mr. Myers filed a Motion to Shorten Time Requirements with his petition for contempt, alleging that his "urgent need for proper mental health care constitutes good cause for expediting this matter."

On December 7, 2022, the court granted the motion to shorten time, and it ordered that the time to answer the petition was five days and a hearing would be held on December 16, 2022. The court also ordered the Department to reimburse the Anne Arundel County Detention Center for expenses and costs incurred in retaining Mr. Myers beyond the time period set in CP § 3-106(c)(2)(i) at the daily rate set in Md. Code. Ann., Corr. Servs.

13

("COR") § 9-402 (2017 Repl. Vol.) and that the Department immediately transfer Mr. Myers to a designated health care facility.

The Department filed a Motion to Vacate Order to Shorten Time Requirements and Motion to Continue Show Cause Hearing, arguing, among other things, that the requirements for issuance of an *ex parte* order under Maryland Rule 1-204(b) were not satisfied, it was not properly served, and no good cause existed to shorten the response time. The Department alleged that "[e]ight days would not be adequate time to prepare for such a hearing," and Mr. Myers would not be prejudiced by adhering to the normal timeframe because he "should be receiving some level of services while housed in the Detention Center."[6]

On December 14, 2022, the Department filed a response to the show cause order and a motion to dismiss. The Department argued that service was improper because the Department received the order to shorten time and to show cause via MDEC and not in accordance with the Maryland Rule governing service of process.[7] It also argued that the

---

[6] The Department also requested dismissal of Robert Neall and Dr. Lisa Burgess as improper parties, stating that Mr. Neall had retired from the position of Secretary of the Maryland Department of Health by the time the petition was filed, and Dr. Burgess was not involved in hospital admissions or administration because these responsibilities had been transferred from the Behavior Health Administration to the Operations Administration in May 2019.

[7] As the Supreme Court of Maryland has explained:

> MDEC is the electronic case management processing and record-keeping system used in the State of Maryland's court system. Through MDEC, state courts "collect, store and process records electronically, and will be able to access complete records instantly as cases travel

14

show cause order did not allow "a reasonable time for preparation of a defense" under Rule 15-206(c)(2). The Department asserted that it could not be held in contempt because there was no willful violation of the commitment order. Rather, the Department was unable to comply due to COVID-19 related issues, discharge barriers, staffing shortages, supply chain delays, processing complexities for undocumented and developmentally disabled defendants, and the lengthy process for adding additional capacity in health care facilities and community placements. The Department also noted that the number of commitment orders in 2022 had nearly doubled.

The Department listed the steps it had taken to increase capacity for committed individuals, including opening a 19-bed assisted living program in July 2021, seeking additional funding for inpatient and assisted living beds; increasing staffing to assist with benefit obtainment; researching options for permanent supportive housing; and hiring an immigration attorney. The Department explained that the implementation of these programs would take time, but that its continued efforts showed that it did not willfully violate the court's order. Finally, the Department argued that the court's pre-hearing order requiring that it reimburse the Anne Arundel County Detention Center should be vacated

---

from District Court to Circuit Court[.]" In essence, MDEC allows for paper records to be available online and on-demand. https://mdcourts.gov/mdec/about *archived at* https://perma.cc/RN8D-EJ5Q.

*Attorney Grievance Comm'n of Md. v. Weinberg*, 485 Md. 504, 540 n.22 (2023), *cert. denied,* ___ U.S. ___, 2024 WL 67856 (2024).

because the sanction would not compel or induce compliance with the commitment order. *See* COR § 9-402(b)(i).

**B.**

**Show Cause Hearing**

The court held a hearing on December 16, 2022. Atif Chaudry, Deputy Secretary of Operations for the Maryland Department of Health, and Michele Fleming, Director of Court Ordered Evaluations and Placements, testified regarding the Department's placement process, the challenges preventing timely admission, and the actions taken to address capacity problems.[8]

The Department has five psychiatric hospitals, with a total of 1,056 beds, that admit individuals deemed IST. When a defendant is deemed IST or not criminally responsible, they are committed to the Department for admission to a hospital for treatment. The typical protocol for admission is to place the patient in the first available bed.[9] If no bed is available, the Department places the patient on a waitlist. In September 2017, the Department centralized the waitlist for all five psychiatric hospitals. Prior to that, each individual hospital had its own list. The Department now has a centralized case management system that monitors the waitlist and placement process. The Department

---

[8] A flowchart of the Department's commitment process was introduced into evidence at the hearing.

[9] The exception to this general rule relates to Perkins, which is reserved for individuals with the most serious charges.

16

tries to place patients near their families, but because of recent capacity issues, the priority is to "get people in as quickly as possible."

Patients are prioritized on the waitlist based on the following factors: the date of the commitment order, the amount of time on the waitlist, the nature of the charges, and the patient's clinical acuity. Acuity is "the intensity of [the patient's] psychiatric condition." Patients are monitored regularly, at least every other week, to evaluate their acuity. Those with "acute psychiatric distress [ ] are prioritized for admission." The Department's centralized admissions teams evaluate new commitment orders every day.

A licensed clinical social worker contacts the detention centers requesting information about each patient's acuity, including suicidal ideation and attempts, homicidal ideation, aggressive behavior, medication compliance, somatic or medical conditions, and whether the detention center can safely maintain the patient until a bed is found. The mental health clinician at the detention center performs the acuity evaluation. Patients receive medication at the detention center, but they do not receive the education services they would receive in a hospital setting. If a patient's acuity worsens, that individual "bumps to the top of the list." Aggressive patients may start out at Perkins, even if they are charged with a low level offense. When the Department receives a commitment order, it sends the court an acknowledgment letter stating that it will admit the patient as soon as possible. It does not inform the court when it is unable to comply with the order.

At the time of the hearing, Mr. Myers was number 47 on a waitlist of 130 patients, and he had been on the waitlist for 24 business days. Based on the most recent acuity check on December 6, 2022, the Department found that he was compliant with his medication

17

and stable at the detention center.  The average wait time for admission of a patient under a commitment order was 33 business days.

Once a patient has been treated at a hospital and no longer needs inpatient care, the individual is "not necessarily ready to go home."  Rather, these patients most often are discharged to a community provider for "lower level step down care."  Certain patients are conditionally released into the community.  If they violate the terms of the conditional release, they are ordered back into the Department's care pursuant to a hospital warrant.  The Department maintains a separate list for these patients and they get priority for placement in a facility.

Mr. Chaudry testified regarding the reasons for the long waitlist of patients needing admission.  The Department had received a "record high number of competency evaluation orders," resulting in a "record high number of court commitment orders for the Department."  The Department had received 827 commitment orders for the year, as of December 16, 2022, which was approximately 80 percent of its total system-wide bed capacity.  Mr. Chaudry indicated that the increase in court orders might be due to the increase in the number of mental health courts in recent years.

There was a "nationwide clinical staffing shortage" affecting the number of open beds in its hospitals and also in the community where patients are discharged.  Significant staffing shortages in the community step-down facilities had severely limited the number of patients that could be safely discharged from Department hospitals.

The COVID-19 pandemic also had a significant effect on the delay in admitting patients because hospitals must comply with local health department procedures and

quarantining requirements when there is an outbreak. COVID outbreaks restrict the ability to discharge current patients and admit new patients off the waitlist. The COVID positivity rate was increasing, and Ms. Fleming stated that there was a significant COVID outbreak at Perkins at the time of the hearing. Both staffing shortages and COVID impact the community providers' ability to maintain existing beds, open new ones, and discharge existing patients. At the time of the hearing, there were 137 patients ready for discharge and 130 who needed admission.

Undocumented immigrant patients and the lack of affordable housing also created obstacles to discharging patients from the hospital to the community. Approximately 10 percent of the Department's patients are undocumented or have immigration-related issues impeding their ability to secure benefits. In addition, the "vast majority" of patients are eligible to receive Social Security Income ("SSI"), which requires a time-consuming process of securing or reinstating benefits for medical care. Mr. Chaudry noted that there recently had been increased challenges in obtaining documentation from these patients. Moreover, certain patients require court action before they can be discharged, and delays in scheduling required hearings also contributed to delays in admitting new patients.

The Department had taken many steps to reduce the waitlist for admission to one of its hospitals. These steps included: (1) implementation of an Incident Command System, under which the Department evaluated the many issues causing the backlog of patients, including the unavailability of community providers to accept discharged patients, which impacted the "back end" of the commitment process; (2) development of a pilot program to discharge certain patients from its psychiatric hospitals to chronic care skilled nursing

19

facilities to address the back-end discharge issue; (3) initiation of funding for additional assisted living beds in the community, which will allow 20 new individuals to be admitted after those 20 are discharged; (4) opening of 43 additional beds across three of its hospitals to accept more patients needing treatment, and implementation of 20 more assisted living unit beds in the community; (5) hiring of an immigration attorney to assist with the placement of undocumented patients; (6) increased coordination to facilitate obtaining benefits prior to discharge; (7) exploration of options for permanent supportive housing for discharged patients; and (8) coordination with the judiciary to facilitate court action for patients who are clinically ready for discharge but remain hospitalized awaiting court action, including regular meetings to address the delay in admitting defendants to hospitals pursuant to commitment orders.

Mr. Chaudry testified that various other initiatives were in the budgetary process, but they were subject to executive privilege. The Department was considering expansion of underutilized buildings to address the capacity issue. Patients could not be discharged to hotels or other empty buildings for supportive housing because the Department would not have proper staffing and security for such facilities.

Mr. Chaudry testified that the Department began exploring options to increase capacity immediately after recognizing that the waitlist numbers were increasing. Ms. Fleming testified that the Department was in compliance with commitment orders at the beginning of the pandemic, but in the 12 to 18 months prior to her testimony, difficulties with community placements began. Mr. Chaudry and Ms. Fleming both testified that the Department was not willfully violating the court's order, but rather, it did not have the

current ability or opportunity to comply. They also testified that sanctions would not induce compliance with the court's order because there were no available beds. The delay in admitting patients was not a deliberate strategy to delay.

## C.

### Court's Ruling

The court issued its ruling at the conclusion of the merits hearing. The court recognized that the problem had "been around for a while," but the court stated that it was addressing the issue only as to Mr. Myers. It noted that there was no question that the order to admit Mr. Myers in ten days was violated. The court found it "unquestionable that [Mr. Myers was] willfully not placed within 10 days, because [the] Department doesn't use 10 days as the criterial [sic] for when people get admitted." Although the Department's criteria for priority of admission based on acuity "might be very valid," "the statute doesn't talk about acuity. It just talks about 10 days."

The court found that it was possible to release someone ready for discharge from the hospital, "even if you pay for a hotel for them, so that you can get someone moved within 10 days." Accordingly, the court found that the Department's failure to admit Mr. Myers was willful because the "only thing" preventing compliance were "things that [could be] controlled with money." In that regard, the court stated: "I know that there are ways to get money which don't need to wait for the annual budget." The court found the Department in contempt "by not moving Mr. Myers within the statutorily required 10 days." The court did not impose a sanction, or a purge provision, for its contempt finding.

21

In addition to finding the Department in contempt, the court found that the Department violated CP § 3-106(d). The court noted that the "statute provides that the Court can come up with other things than just the payment to the Detention Center in order to compel compliance." The court then stated:

> The indication was it costs $600 a day at your facility.[10] So the $45 at the detention center is really not a motivation. So the sanction of the Court will be $1,000 a day and to compel you to place Mr. Myers and it will continue until he's placed.[11]

On January 25, 2023, the Department filed in the circuit court a Motion for Stay Pending Appeal, claiming that: (1) it was improperly served; (2) the court failed to provide sufficient time for preparation of a defense; (3) it lacked the present ability to comply with the commitment order or the purge provision of the contempt order; and (4) the monetary sanction imposed was excessive and incapable of coercing compliance with the contempt order.[12] On February 16, 2023, the court denied the motion.

---

[10] Mr. Chaudry testified that the cost of patient care in the hospital was approximately $600 per day.

[11] The court earlier had noted that CR § 3-106(c) was not worded as a contempt provision and did not require a finding of willfulness. The court noted that it "simply says if the Health Department fails to admit a defendant to a designated health facility within the time period specified in (2)(i), which is 10 days, the court may impose any sanction reasonably designed to compel compliance."

[12] The Department attached the Affidavit of Mary Scanlan as an exhibit to the motion. Ms. Scanlan stated that, based on a review of the mail log maintained in the Maryland Office of Attorney General, Civil Litigation Division, the office never received the Petition for Constructive Civil Contempt and Request for Show Cause Order, the Order to Show Cause entered December 8, 2023, or the Order to Shorten Time, entered December 8, 2023.

On March 9, 2023, this Court issued an order granting the Department's Motion for a Stay Pending Appeal, noting that the Department had purged the contempt by placing Mr. Myers in a designated health care facility. We ordered that payment of the fine be stayed pending the outcome of this appeal.

## III.

### Contempt Proceedings: Zachary Murphy

### A.

### Petition for Contempt and Show Cause Order

On December 19, 2022, Mr. Murphy filed a Petition for Constructive Civil Contempt and Request for Show Cause Order directing the Department and officials to show cause why they should not be held in contempt for failure to comply with the court's November 21, 2022 commitment order directing the Department to admit him to a designated health care facility within 10 business days based on the court's determination that he was IST and a danger to himself or others.[13] The petition stated that Mr. Murphy had been awaiting admission for 29 days and remained detained at the Jennifer Road Detention Center. The petition also noted that Mr. Murphy "continue[d] to exhibit symptoms of serious mental illness, continues to be dangerous as a result of his mental disorder, and is not presently receiving appropriate mental health care and treatment." Mr.

---

[13] The petition named the following officials: Dennis R. Schrader, Secretary, Maryland Department of Health, Lisa A. Burgess, M.D., Acting Deputy Secretary, Behavioral Health Administration, Marshall Henson, Operations Director, Behavioral Health Administration, and Michele Fleming, LCSW-C, Director, Court Ordered Evaluations & Placements.

Murphy requested the imposition of statutory sanctions, as well as a contempt order with a purge provision to immediately admit Mr. Murphy to a designated health facility.

Mr. Murphy filed a Motion to Shorten Time Requirements with his petition for contempt. He alleged that his safety and well-being were in serious jeopardy because he was not receiving appropriate mental health care and treatment, he was in danger, and his "urgent need for proper mental health care constitute[d] good cause for expediting this matter."

On December 21, 2022, the court granted the motion to shorten time and issued a show cause order requiring the Department and all Department officials named in the petition to personally appear for a hearing on December 29, 2022.[14] The court also ordered the Department to reimburse the Anne Arundel Detention Center for expenses and costs related to Mr. Murphy's detainment at the rate specified in COR § 9-402(b) and to immediately transfer him to a designated health care facility.

On December 27, 2022, the Department filed a Motion to Vacate Order to Shorten Time Requirements and Motion to Continue Show Cause Hearing, arguing that it did not have the opportunity to respond to the motion to shorten time before it was granted. The Department argued that it was not properly served with the order to show cause, and due to the holidays, it had only three days to prepare for the hearing. It asserted that three days did not allow a reasonable time to prepare for the hearing as required by Maryland Rule

---

[14] The judge hearing Mr. Murphy's case was different from the one that heard Mr. Myers' case.

24

15-206(c)(2), and Mr. Chaudry and Ms. Fleming were both unavailable to testify at the hearing due to pre-planned leave.[15] The Department also argued that Mr. Murphy would not be prejudiced if the hearing was not expedited because he was "receiving some level of services while housed in the Detention Center."

On December 29, 2022, as explained in more detail, *infra,* the court held a hearing on the petition for contempt. It granted the Department a one-week continuance because Mr. Chaudry and Ms. Fleming were unable to attend.

On January 1, 2023, the Department filed a response to the show cause order and a motion to dismiss. It alleged that Mr. Murphy did not serve the show cause order and petition for contempt in accordance with Rule 2-121, and the scheduled hearing dates, even with the one-week continuance, did not allow for a reasonable time to prepare a defense to the petition for contempt.

The Department also alleged that it could not be held in contempt because it did not willfully violate the commitment order. It asserted that it was unable to comply with the order because of discharge delays created by the COVID-19 pandemic, staffing shortages, poor supervision in step-down facilities, supply chain issues, and the lengthy processing time related to the discharge and placement of undocumented and disabled patients. The Department also stated that the number of commitment orders nearly doubled from 2021 to 2022. The discharge barriers related to existing patients hindered the Department's

---

[15] The Department stated that Dr. Burgess and Mr. Henson were not proper parties to the action because the Behavioral Health Administration was no longer responsible for hospital admissions related to patients deemed IST.

ability to admit newly committed patients within the 10-day deadline. The Department summarized its efforts to address the bed shortages, noting that it opened a 19-bed assisted living program in July 2021, sought additional funding for inpatient beds and discharge placements, increased staffing to assist with patient benefits, and hired an immigration attorney. Finally, the Department argued that no sanction imposed by the court would induce compliance with the commitment order.

## B.

### Show Cause Hearings

The court held a show cause hearing on the contempt petition on December 29, 2022. The court began by acknowledging that it was moving fast, which was a challenge for counsel for the Department, but it stated that the challenge was less than in typical cases because almost identical petitions previously had been filed. The Department requested a continuance because the Deputy Secretary, Mr. Chaudry, was unable to attend. The court initially denied that request, stating that the issues were not novel. The court noted that prior contempt petitions had been filed and that "everybody is aware" of issues relating to compliance with the 10-day requirement for placing a committed individual in a designated health care facility. The court stated that Mr. Murphy was "languishing at the detention center, where they don't have appropriate mental health resources," and "there is no effort to try to restore [him] to competency." The court also stated that, when the Department has a commitment order, it does not "have the option of saying, no, we don't have room."

Before hearing any testimony, the court expressed frustration at having to proceed with this issue, stating that the Department was "wasting my time, and counsel's time and

26

your time." It stated its view that the Department was "willfully refusing to comply with [the] order," and although it was "happy to hear" testimony, the Department "can't just say, we don't have room at the inn."

The court then indicated that it had read the pleadings in Mr. Myers' case, and it addressed the Department's argument that COVID-19 played a role in the inability to comply with the order, stating:

THE COURT: The idea that COVID has played role in this, I understand that. That is all the more reason to start preparing when COVID started, however many years ago it has been now.

When I have jury trials, and things that have to get done in a timely manner, I am not telling you anything you don't know. I oversee the criminal division.

I have things that need to get done in timely manner. We ripped apart this courthouse. We ripped out rooms, libraries, so we could accommodate what needed to be done and deal with COVID and those issues.

I am not aware and you can share it with me if you want through testimony or however you want to present it, of any efforts of any significance made to deal with this -- what I am going to call crisis.

So I am going to stop trying to steal defense counsel's thunder. But I am beyond frustrated with the department of health.

[COUNSEL FOR THE DEPARTMENT]: And I certainly understand that, Your Honor. And I can appreciate the Court's frustration. This is not an issue that the department takes lightly in any way, shape or form.

THE COURT: I apologize if it feels like am going to jump on you.

[COUNSEL FOR THE DEPARTMENT]: I am used to it, Your Honor.

THE COURT: I get it. I apologize in advance. What is it they have done to prepare for this?

27

And I realize there has also been an increase in the number of people being found incompetent. Those numbers, they seem to have been going up over the years, slowly. But again all the more reason to have made appropriate plans, or to have requested emergency funding to hire more doctors, get more, get additional physical spaces. You know?

Counsel for the Department noted that four of the five psychiatric facilities were licensed health care hospitals subject to rules and regulations, and it was "not just as simple as essentially opening a space and hoping that things go well. We are talking about dangerously, acutely mental[ly] ill individuals," who require staff to manage. Counsel stated that the pandemic or the ripple effects it created were not foreseeable.

The court expressed frustration that Mr. Chaudry was unavailable to testify, stating that he was "thumbing his nose at his responsibilities." It stated that Mr. Chaudry's absence was "consistent with the idea that the health department doesn't see this as an urgent matter that needs to have been resolved yesterday." The court then stated that the hearing would begin that day, but it agreed to continue the hearing until January 5, 2023, so Mr. Chaudry could testify.

Secretary Schrader testified for the Department.[16] Mr. Schrader, along with Mr. Chaudry and Ms. Fleming, who testified when the court reconvened on January 5, 2023, explained the placement process for criminal defendants committed to the Department, the

---

[16] Ambha Munat, manager of the records department at the Anne Arundel County Detention Center, testified for Mr. Murphy. He testified about letters he sent to the court and the Department notifying them that the Department had failed to comply with the 10-day deadline and that Mr. Murphy continued to be held at the detention center. These letters as well as documentation regarding acuity evaluations and a Department flowchart of the commitment process were introduced into evidence at the hearing.

challenges with regard to compliance with the 10-day admission deadline, and efforts the Department had made to increase inpatient bed capacity and otherwise achieve compliance with the statutory mandate.[17]

Ms. Fleming addressed the history of the Department's response to admissions delays it encountered starting in 2017. That year, she centralized the waitlist for the five psychiatric hospitals. There were approximately 1,056 beds across the five facilities, up from 900 in 2016. Mr. Schrader testified that he participated in negotiations with the legislature when the 10-day limit was established and noted that the Department "thought the 10-day limit was a good target."[18] From 2018 until February 2020, the Department was in compliance with the 10-day statutory deadline. Six years ago, when Mr. Schrader became the Secretary, the Department increased capacity by 120 beds in one year's time.

Mr. Chaudry testified that "it was easier to open those units at the time," but that at this point, there were no units available in its hospitals that could be opened without any regulations. Even if the Department had available staffing, "the units would not be available for use without regulation for this patient population."

Mr. Schrader explained that the Department admitted patients based on their acuity, which was monitored on a daily basis, balanced with the length of time a patient had been

---

[17] At the conclusion of the December 29, 2022 hearing, the Department noted that none of the individuals named in the petition for contempt or show cause order had been personally served. Counsel for the Department agreed to accept service on their behalf at the hearing.

[18] The court stated that the 10-day deadline was not a target, but a mandate. Mr. Schrader agreed.

on the waitlist.[19]  A licensed clinician sends an email to the detention centers every two weeks requesting an acuity assessment and instructing them to reach out if the acuity assessment changes.  Patients found not criminally responsible are generally prioritized over those found IST.  In addition, at the request of District Court judges, the Department also prioritized "patients with 30/60/90-day charges," so their charges would not "time out."

Mr. Schrader directed, from a policy perspective, that once a patient is on the list for longer than 30 days, the Department should "get really serious" about finding a placement.[20]  There are five factors that justified a "clinical override" and prioritized a patient on the waitlist:  (1) whether a patient is eating or drinking; (2) involvement in physical altercations; (3) medication compliance; (4) medical problems; and (5) safety risks.  The Department processed commitment orders daily.  All orders were entered into a centralized electronic case management system, which created a waitlist queue.  The average wait time for placement at the time of the hearing was 35 business days.  The Department notified the detention center of an admission date once that date was secured, but it did not provide regular status updates regarding placement.

At the time of the January 5, 2023 hearing, Mr. Murphy was number 54 on a waitlist of 150, but because he could only be admitted to Perkins, he was number 7 for that

---

[19] Ms. Fleming acknowledged that the statute does not mention acuity checks and does not authorize the Department to override the 10-day period based on acuity.

[20] When asked whether the Department had a 30-day policy for placement, Ms. Fleming stated that "[t]his was the first I've heard of the 30-day . . . I'm aware the statute is 10 days, 10 business days.

particular facility.  Mr. Murphy had been incarcerated in excess of 30 days at the detention center without receiving any services to attain competency.

Based on an acuity check performed on January 3, 2023, medical providers at the detention center recommended that Mr. Murphy be next in line for hospitalization due to a history of suicide attempts and his failure to take medication or engage in treatment.  Ms. Fleming testified that, based on this new information, the Department "may follow up . . . however, most of the time when there is a grave concern[,] the jail will reach out."  At the time of the hearing, the detention center had not yet reached out to Ms. Fleming to request an override for Mr. Murphy, and it had not requested a psychiatric consult from the Department.

The Department delegated the responsibility for determining placement on the waitlist to the detention center based on the detention center's acuity assessment.  Ms. Fleming explained that prioritization based on acuity "began five or six years ago as a criticism of the department during the last contempt."  She acknowledged that all the patients "have to come in" because they are committed to the Department's care.  She also agreed that the detention centers failed to recognize Mr. Murphy's prior suicide attempts and improperly assessed his acuity prior to the January 3, 2023 evaluation.

The Department had been experiencing challenges achieving compliance with the 10-day order for approximately 18 months.  A record high number of competency

evaluation and commitment orders in 2022 contributed to the waitlist for admission to a designated health care facility.[21]

COVID also impacted the Department. When there were outbreaks, the facilities were locked down. For example, admission rates were delayed at Perkins due to a COVID outbreak, which prohibited the Department from admitting new patients on affected units and slowed its ability to transition inpatients to continued care, i.e., step-down beds. Mr. Schrader also testified to other "back end" issues preventing the discharge of current patients, including un- or under-documented immigrants, the departure of 40,000 clinicians in Maryland in the past two years, and staffing exhaustion at all levels in both hospitals and community facilities. Mr. Chaudry stated that the Department maintained its current operations and census only by paying staff overtime.[22]

Mr. Schrader noted another challenge to compliance with respect to the Community Forensics After-Care Program, a "parole and probation operation," under which patients who have already been adjudicated not criminally responsible are placed into supervised community care. When these conditionally-released patients have problems, the Department must re-place them in a facility. At the time of the hearing, there were 180 individuals that had returned to the hospital from conditional release. These individuals accounted for 20 percent of the Department's inpatient capacity. Mr. Schrader had monthly

---

[21] There was "an all-time high of 2,144 competency evaluation orders" in 2022, which resulted in 865 commitment orders, a significant increase from the 740 orders in 2021.

[22] In fiscal year 2022, the Department paid $32 million in overtime pay and projected an even higher amount in fiscal year 2023.

meetings with judges and other court representatives to discuss efforts to increase inpatient capacity and pressure points. The Department also started quarterly meetings with all the mental health courts and the judiciary's mental health coordinator.

Mr. Schrader and Mr. Chaudry testified regarding difficulties placing undocumented patients. One hundred of the 144 patients on the waitlist had issues with their immigration status. These patients were difficult to place because they are not eligible for Medicaid benefits, and therefore, the facilities do not receive payment and will not accept them. To address this issue, the Department had started moving undocumented patients to the Western Maryland Hospital Center ("WMHC"). The WMHC had 150 empty beds, but the Department was unable to move all 100 undocumented patients there because WMHC was not yet designated as a psychiatric facility. Obtaining the proper licenses for WMHC to operate as a psychiatric facility was "a very high priority initiative." The first two patients were moved to WMHC under a pilot program.

Mr. Chaudry also testified about the pilot program under which patients would be discharged from psychiatric hospitals into chronic care hospitals with skilled nursing licenses. A limited number of skilled nursing providers were able to take the Department's patients because of their complex medical needs, criminal history, and the stigma associated with their history of psychiatric illness. The Department operated two chronic care hospitals that had skilled nursing licenses, WMHC and Deer's Head Hospital Center. Staffing shortages at these facilities limited the number of patients that could be discharged there. The Department's goal was to have eight patients placed there by the end of that month. Mr. Chaudry distinguished between having physical capacity versus budget or

license capacity, explaining that although a portion of the WMHC was vacant, the Department was still securing proper funding and licenses.

Other actions the Department took to reduce the backlog of patients included: (1) the creation of an incident command center to address the capacity issues, giving Mr. Chaudry "carte blanche resources that are under [Mr. Schrader's] control" to create and pursue solutions; (2) the declaration of an internal emergency, in writing, on September 15, 2022; (3) the obtainment of funding to open 40 additional assisted living beds, twenty of which were funded in 2021, and the other 20 in 2022; (4) the implementation of "utilization management" to educate and encourage hospital providers to discharge patients to residential treatment programs which provide supportive housing and psychiatric "wraparound services";[23] (5) the opening of 43 additional beds in the hospital system; (6) "front end" initiatives to divert individuals away from the criminal justice system, including $100 million in funding to Sheppard Pratt for "targeted tertiary and quaternary care," as well as a mobile crisis unit; and (7) hiring an immigration attorney in 2021 and directing, a few weeks prior to the hearing, that additional immigration staff be hired.

As a result of the Department's efforts, the back log of patients waiting for discharge decreased from 180 to 144 in 90 days, from October 2022 to December 2022. Mr. Schrader testified that the Department was "not just sort of hoping things [we]re happening. [It was]

---

[23] These programs reduced the back log of patients waiting to be discharged. Mr. Chaudry noted that discharge to inappropriate settings led to deterioration, instability, and an increased chance of committing additional crimes.

34

drilling in two, three, four, levels down into the system, and from there . . . developing . . . strategies to push improvements."

When asked why the Department did not fund additional beds, Mr. Chaudry stated that it was exploring "various additional measures" that were in the budget review process and subject to executive privilege. The Department did not open any additional facility beds in 2022. Mr. Chaudry testified that, although the courts may have used federal funding for COVID-19 to reconfigure courtrooms and for related mitigation, the Department could not use this emergency funding to open an additional psychiatric unit or fund staffing for it.

Mr. Schrader and Mr. Chaudry stated that a monetary sanction against the Department would not induce compliance because all the designated health care facilities were currently at capacity. They both stated that the Department's violation was not willful. Ms. Fleming testified that she was not "ignoring the Court's order"; rather, the Department could not safely admit Mr. Murphy to a designated health care facility at this time. Mr. Chaudry acknowledged that Mr. Myers, the subject of an earlier contempt order, was admitted after a finding of contempt, but he explained that Mr. Myers' admission "was not a direct cause [and] effect" of the contempt of order; rather, it was a "normal order," consistent with the predicted date of admission. Counsel for the Department then noted the many challenges the Department faced, including the increase in commitments that year, from 740 in 2021 to 865 so far in 2022. It also noted the "numerous discharge barriers." Counsel argued that there was no willful violation of the court's order.

35

## C.

### Court's Ruling

The court summarily denied the Department's motion to dismiss based on improper service and a lack of adequate time to prepare for the hearing. It then held the Department in contempt for failing to comply with the court's commitment order.

The court stated that the Department's efforts to address capacity issues related to the "front door and back door" of the admissions process were insufficient. It found that the Department had created "policy decisions [and] . . . a special emergency task force," but that those steps were not solving the problem. The court noted that, when previously faced with a similar crisis in 2017-18, the Department was able to add 120 beds in one year, and in 2021, it was able to add 43 beds.

With regard to challenges presented by the COVID-19 pandemic, the court stated that the Department was not adapting, and there was no evidence that the COVID outbreak at Perkins had "prevented people from entering." It also stated that the Department did not provide a "specific explanation as to how [the nationwide and statewide medical provider shortage] has impacted our state-run mental health facilities . . . or Mr. Murphy's placement."

The court noted that the Department described the 10-day requirement "as an aspiration or target" and not a mandate, and it noted that the Department did not simply receive a court order, but instead, Mr. Murphy was committed to its care. The court stated that the Department was "creating [its] own law" with "their 30 to 35 business-day goal" and "completely ignoring the 10-day mandatory order." With regard to "why the numbers

of competency assessments and findings of incompetence have increased," the court noted that the Department could not provide an explanation, and it stated: "I don't think it is that complicated. I think there was a clear slowdown when COVID hit, and now it is moving in the other direction."

Regarding immigration issues, the court stated: "I still don't fully understand those but it would seem that if they are taking up beds, people who have immigration issues, in our mental health facilities, that perhaps they could move to that western Maryland facility." The court noted that the facility had 100 beds, but only 2 patients had moved in. The court also found that the backlog started at least a year and a half prior to the hearing and that the Department had added "20 beds or 40 beds [ ] in 2022," noting that the planning for that likely started earlier.

The court stated that the Department had the option to seek emergency funding and emergency legislation for new facilities and new medical personnel positions and to expedite the certification process for a psychiatric facility, but it had not done anything, despite declaring an emergency in September 2022. The court found that the Secretary and the Department had "willfully chosen not to comply" with the commitment order, and "[a]ny inability to comply [wa]s of their own making simply because they haven't prepared."

Accordingly, the court found the Department in contempt. It stated that the Secretary and the Department could purge the contempt by paying $2,000 per day to "the Anne Arundel County government who oversees the Anne Arundel County detention center" until they complied with the order to place Mr. Murphy into a designated health

care facility. In its oral ruling, the court stated that it was ordering as a separate sanction that the Department and its Secretary reimburse the Anne Arundel County Detention Center $205.82 a day, the cost to house someone in the detention center until Mr. Murphy was admitted to a department facility. In its written order, the court stated that this sanction, "$6,380.42 for past expenses to retain Mr. Murphy ($205.82 per day x 31 days) plus $205.82/day beginning 1/5/23" until they complied with the commitment order, was "an additional purge provision."[24] The court then ordered, "as a final purge provision," that the Department immediately comply with the court's November 21, 2022 commitment order. The court denied the Department's request for a stay, stating that the purpose of the sanctions was "to get the department moving" because "[d]eclaring emergencies and creating task forces doesn't get this done."

The record contains a hearing sheet regarding a hearing on "review of contempt" dated May 2, 2023. The sheet contains the following notation: "Court imposed sanction of $10,702.64 within 30 days." It also states that the court waived the $2,000 per day purge sanction, finding that the Department had complied with the January 5, 2023 order and purged the contempt.

On March 14, 2023, this Court issued an order granting the Department's motion for stay pending appeal, noting that the Department had purged the contempt by placing

---

[24] The court stated its "understanding of the going cost at Jennifer Road to house someone is $205.82."

38

Mr. Murphy in a designated health care facility.  We ordered that payment of the fine be stayed pending the outcome of this appeal.

## DISCUSSION

Although the appeal involves 14 individual appellees, and multiple orders, we will divide our analysis by jurisdiction.  We will discuss the Anne Arundel County contempt orders first, and then we will discuss the imposition of statutory sanctions in both the Anne Arundel County and Baltimore City cases.

## I.

### Anne Arundel County Contempt Orders

The Department contends that the judges in Mr. Myers' and Mr. Murphy's cases erred in holding it in contempt.  It argues that the judges "abused their discretion by conducting hearings without proper service or giving the Department adequate time to prepare its defenses."  It further asserts that the judges abused their discretion in finding that it willfully failed to comply with the court's orders because the record showed that it lacked the ability to comply.

Appellees contend that the circuit court did not err or abuse its discretion in holding the Department in contempt.  They assert that they properly served the show cause orders and orders to shorten time on the Department via MDEC and first-class mail, and the Department had actual notice of the contempt petition, show cause order, and order to shorten time.  Appellees contend that the court did not abuse its discretion in holding the Department in contempt because the Department improperly prioritized patients for

39

admission based on acuity, failed to prepare for a foreseeable bed shortage, and did not take adequate actions to solve the problem of delayed admission in violation of the statute.

## A.

## Improper Service and Lack of Jurisdiction

"It is fundamental that before a court may impose upon a defendant a personal liability or obligation in favor of the plaintiff or may extinguish a personal right of the defendant it must have first obtained jurisdiction over the person of the defendant." *Flanagan v. Dep't of Human Res.,* 412 Md. 616, 623–24 (2010) (quoting *Lohman v. Lohman*, 331 Md. 113, 125 (1993)). There can be no judgment against a defendant "unless the defendant has been notified of the proceeding by proper summons, for the court has no jurisdiction over him until such service is properly accomplished, or is waived by a voluntary appearance by the defendant, either personally or through a duly authorized attorney." *Id.* at 624. With regard to constructive contempt, the Maryland Rules on service of process dictate "the basic requirements of due process." *Id.* (quoting *Reamer v. Reamer*, 246 Md. 532, 535 (1967)).

If a defendant has not been properly served or the court has not otherwise acquired jurisdiction over the defendant, the action is subject to dismissal. Md. Rule 2-507(b). *See also* Md. Rule 2-322 (on motion to dismiss for insufficient service, a court "may dismiss the action or grant such lesser or different relief as may be appropriate"). *Accord Conwell Law LLC v. Tung*, 221 Md. App. 481, 506 (2015). Whether to dismiss, however, "rests in the sound discretion of a trial judge . . . based on his or her weighing of the balance of the rights, interests, and reasons of the parties for the delay and the public demand for prompt

resolution of the litigation." *Flanagan*, 412 Md. at 631. A court's decision to dismiss for improper service or lack of jurisdiction is reviewed for an abuse of discretion. *Conwell*, 221 Md. App. at 499.

Rule 15-206(d) provides that

> a copy of any petition [for constructive civil contempt] and other document filed in support of the allegation of contempt, shall be served on the alleged contemnor pursuant to Rule 2-121 or 3-121 or, if the alleged contemnor has appeared as a party in the action in which the contempt is charged, in the manner prescribed by the court.

Rule 2-121, which governs in personam service of process, states that:

> Service of process may be made . . . (1) by delivering to the person to be served a copy of the summons, complaint, and all other papers filed with it; (2) if the person to be served is an individual, by leaving a copy of the summons, complaint, and all other papers filed with it at the individual's dwelling house or usual place of abode with a resident of suitable age and discretion; or (3) by mailing to the person to be served a copy of the summons, complaint, and all other papers filed with it by certified mail requesting [restricted delivery].[25]

Service by MDEC and first class mail is not included in the rule as a method of proper service.

Appellees make several arguments why service nevertheless was proper here. We need not address these arguments because, even if appellees failed to properly serve the Department, reversal is not required. As explained, *supra*, whether to dismiss an action based on improper service and lack of personal jurisdiction "rests in the sound discretion

---

[25] Under Rule 2-124(k), "[s]ervice is made on an officer or any agency of the State of Maryland by serving (1) the resident agent designated by the officer or agency, or (2) the Attorney General or an individual designated by the Attorney General in writing filed with the Clerk of the Supreme Court."

41

of the trial judge" and will not be set aside absent clear abuse. *Conwell*, 221 Md. App. at 505. The trial judge is in the best position to weigh the rights of the parties in consideration of the public's interest in promptly resolving the issues at hand. *Id.*

Here, we conclude that there was no abuse of discretion in denying the Department's motion to dismiss. The Department, which had received a commitment order from the court and, by its own admission, was attempting to comply with that order, does not dispute that it received notice of the hearing and the related filings. Accordingly, it had actual notice. Moreover, the Department responded to the allegations in its pleadings and appeared at the hearing and presented its cases.[26] Under these circumstances, the Department waived any objection to service. *See Selective Way Ins. Co. v. Fireman's Fund Ins. Co.*, 257 Md. App. 1, 29–30 (2023) ("a defendant waives service by responding to a complaint"); *LVI Env't Servs. v. Academy of IRM*, 106 Md. App. 699, 707 (1995) ("Once a party speaks to the merits of a case, the [party] has made 'a voluntary appearance, submitting [it]self to the jurisdiction of the court for all subsequent proceedings.'") (quoting *Guen v. Guen*, 38 Md. App. 578, 587 (1978)). *Accord O'Connor v. Moten*, 307 Md. 644, 648 (1986) ("by joining with his preliminary objection a motion to strike the default judgment because of the existence of meritorious defenses, [defendant] would have waived his objection to personal jurisdiction"), *abrogated on other grounds*, *Bienkowski v.*

---

[26] During the show cause hearing related to Mr. Murphy, the Department agreed on the record to accept service for the individuals named in the petition.

*Brooks*, 386 Md. 516 (2005).  Given these circumstances, the trial court properly exercised its discretion in declining to dismiss for improper service.

## B.

### Insufficient Time to Prepare for Hearing

The Department notes that Rule 15-206(c)(2) provides that: (1) a defendant subject to a show cause order is entitled to at least 10 days to respond; and (2) in setting a hearing on a petition for contempt, the court "shall allow a reasonable time for the preparation of a defense."[27]  It asserts that the court erred in granting appellees' motion to shorten time for a response because the requirements for such an order, which are set forth in Rule 1-204(b), were not satisfied.[28]  The Department further contends that the court, in issuing the show

---

[27]  Rule 15-206(c)(2) provides:

> Unless the court finds that a petition for contempt is frivolous on its face, the court shall enter an order providing for (i) a prehearing conference, or (ii) a hearing, or (iii) both.  The scheduled hearing date shall allow a reasonable time for the preparation of a defense and may not be less than 20 days after the prehearing conference.  An order issued on a petition or on the court's own initiative shall state:
>     (A)    the time within which any answer by the alleged contemnor shall be filed, which, absent good cause, may not be less than ten days after service of the order;
>     (B)    the time and place at which the alleged contemnor shall appear in person for (i) a prehearing conference, or (ii) a hearing, or (iii) both and, if a hearing is scheduled, whether it is before a magistrate pursuant to Rule 9-208(a)(1)(6) or before a judge[.]

[28]  Rule 1-204(b) provides that entry of an *ex parte* order shortening the time for an action if:

> the motion sets forth (1) facts which satisfy the court that the moving party attempted but was unable to reach agreement with the opposing

cause orders, allowed it only eight days to prepare for the *Myers* hearing and five days (excluding holidays and weekends) to prepare for the *Murphy* hearing, which was not "a reasonable time for preparation of a defense," as required by Rule 15-206(c)(2).

Appellees do not respond to this contention.

In a civil case, the party asserting error must show prejudice. *See Barksdale v. Wilkowsky,* 419 Md. 649, 661 (2011) (appealing party has burden to show error in civil cases caused prejudice). The Department has not alleged prejudice as a result of the expedited hearings in these cases.

The record indicates that the courts were concerned about a recurring problem with individuals in need of treatment remaining in the detention center after the time that they were supposed to be admitted to a psychiatric facility. The Department was able to file a motion to vacate the orders shortening time and give its reasons why it believed that the proceedings should not be expedited. With regard to the hearing in Mr. Murphy's case, where the Department advised that two of its key witnesses were unavailable to testify, the court continued the hearing to allow them to participate. On the record here, and given the lack of any specific claims of prejudice, we cannot conclude that there was reversible error in expediting the proceedings in these cases.

---

party and that the moving party notified or attempted to notify the opposing party of the time and place the moving party intends to confer with the court; or (2) facts which satisfy the court that the moving party would be prejudiced if required to comply with the requirements of subsection (b)(1) of this Rule.

## C.

## Contempt Findings

We now turn to the merits of the contempt orders.  Before addressing the parties' specific claims, we will briefly summarize the law on contempt and discuss the standard of review.  We reverse a court's decision to hold a party in contempt only when there is a showing that the findings of fact on which the contempt order is premised were clearly erroneous or that the court abused its discretion.  *Crawford*, 237 Md. App. at 111.  A court's interpretation and application of a statute or case law in its finding of contempt is reviewed *de novo* for legal error.  *Id.*

Contempt proceedings can be classified as direct or constructive and as criminal or civil.  *Id.* at 109.  As we explained in *Crawford*:

> Direct contempt occurs when the contempt is "committed in the presence of the judge presiding in court or so near to the judge as to interrupt the court's proceedings."  Rule 15-202(b).  Direct contempts may be summarily punished to protect the orderly administration of justice and vindicate the dignity of the court.  *Smith v. State*, 382 Md. 329, 338 (2004); *Espinosa v. State*, 198 Md. App. 354, 387 (2011).

> "'Constructive contempt' means any contempt other than a direct contempt."  Rule 15-202(a).  In constructive contempt proceedings, the accused contemnor must have "an opportunity to challenge the alleged contempt and show cause why a finding of contempt should not be entered."  *Fisher v. McCrary Crescent City, LLC*, 186 Md. App. 86, 119 (2009), *cert. denied*, 562 U.S. 1060 (2010).

> Civil contempt proceedings are "intended to preserve and enforce the rights of private parties to a suit and to compel obedience" with court orders and decrees.  *Dodson v. Dodson*, 380 Md. 438, 448 (2004) (quoting *State v. Roll and Scholl*, 267 Md. 714, 728 (1973)).  "Civil contempt 'proceedings are generally remedial in nature and are intended to coerce future compliance.'"  *Royal Inv. Group, LLC v. Wang*, 183 Md. App. 406, 447 (2008) (quoting *Roll*, 267 Md. at 728), *cert. granted*, 408 Md. 149 (2009), *appeal dismissed*,

45

409 Md. 413 (2009). Regardless of the penalty imposed in a civil contempt action, it "must provide for purging." *Dodson*, 380 Md. at 448. A purge provision offers the party "the opportunity to exonerate him or herself, that is, 'to rid him or herself of guilt and thus clear himself of the charge.'" *Jones v. State*, 351 Md. 264, 281 (1998) (quoting *Lynch v. Lynch*, 342 Md. 509, 520 (1996)).

Criminal contempt proceedings, in contrast, are intended to "'punish for past misconduct, which may no longer be capable of remedy.'" *Bradford*, 199 Md. App. at 193 (quoting *Arrington v. Dep't of Human Res.*, 402 Md. 79, 93 (2007). The sanctions in these proceedings are "punitive in nature," and therefore, they do not require a purging provision. *Id.* at 194 (quoting *Arrington*, 402 Md. at 83). Unlike civil contempt, which generally must be proved by a preponderance of the evidence, the burden of proof in criminal contempt proceedings is beyond a reasonable doubt. *Gertz v. Md. Dep't of Env't*, 199 Md. App. 413, 423, *cert. denied*, 423 Md. 451 (2011). [29]

*Crawford*, 239 Md. App. at 109–11 (footnote omitted).[30]

The contempt orders here were for constructive civil contempt. The Department does not dispute that it did not comply with the court's commitment orders. The failure to comply with a court order, however, is insufficient, by itself, to support a contempt finding. *See Ashford v. State*, 358 Md. 552, 572–74 (2000) (where proof limited to lack of

---

[29] Maryland Rule 15-207(e)(2) sets forth an exception to the rule that civil contempt must be proved by a preponderance of the evidence. When the constructive civil contempt proceeding is to enforce a spousal or child support order, the burden of proof is "clear and convincing evidence that the alleged contemnor has not paid the amount owed." *Id.*

[30] In *Crawford*, 239 Md. App. 84, 126 (2018), we held that the circuit court erred in holding the Department in contempt based on its failure to immediately administer competency evaluations and admit defendants deemed IST and dangerous to designated health care facilities pursuant to court orders. We concluded that the Department could not be held in constructive civil contempt for delayed compliance with the commitment orders because it had complied with the orders prior to the contempt finding. *Id.* at 125. Here, by contrast, the Department had not complied with any of the commitment orders at the time of the contempt findings.

46

compliance with a court order, evidence insufficient to support the finding of contempt). Rather, before a party can be held in contempt, there must be a showing that the failure to comply with the court order was willful. *Crawford*, 239 Md. App. at 111; *Dodson*, 380 Md. at 452.[31]

The Department contends that it did not willfully fail to comply with the contempt orders, and therefore, it could not be held in contempt. It asserts that the evidence showed an inability to comply due to an unprecedented volume of commitment orders that year, staffing shortages, ongoing COVID-19 outbreaks, and an increase in undocumented patients, among other things. It argues that it presented evidence of its efforts to address the issues, which showed that its conduct was not willful. Because the Department did not have the "present ability to comply" and was not engaging in a deliberate strategy of delay at the time of the hearings, it contends that the court erred or abused its discretion in finding it in contempt.

Appellees contend that the court did not err or abuse its discretion in holding the Department in constructive contempt. They argue that the court reasonably found that the failure to admit Mr. Myers was willful because the Department used acuity reports instead of the 10-day deadline to prioritize admission of patients, and in doing so, the Department "rendered itself unable to comply" with the commitment orders. Although evidence regarding the Department's efforts to comply may have shown that it was not acting maliciously, its failure to prepare and take adequate steps to solve the problems amounted

---

[31] "[A] negligent failure to comply with a court order is simply not contemptuous in a legal sense." *Dodson*, 380 Md. at 452.

47

to willful conduct. Appellees similarly argue that the court in Mr. Murphy's case properly found that "[a]ny inability to comply is of their own making simply because they haven't prepared."

As indicated, it is undisputed that the Department failed to comply with the 10-day statutory deadline for admitting Mr. Myers and Mr. Murphy to a designated health care facility. The question here is whether the court was clearly erroneous in finding that the failure to comply was willful. If the evidence did not support a finding of willfulness, the court erred in finding the Department in contempt.

**1.**

**December 16, 2022 Hearing: Mr. Myers**

At the December 16, 2022 hearing, the court based its finding of willful conduct on three factual findings: (1) that the Department does not use the 10-day statutory deadline as a criteria for admitting patients, but it instead places people based on acuity; (2) that the Department could have released patients ready for discharge to hotels or other available properties; and (3) that the only thing holding the Department back was money, and "there are ways to get money which don't need to wait for the annual budget." Based on the record, we conclude that the court erred or abused its discretion in finding the Department in contempt.

In reviewing factual findings on which a contempt order is based, "[i]t is not our task to re-weigh the credibility of witnesses, resolve conflicts in the evidence, or second-guess reasonable inferences drawn by the court, sitting as fact-finder." *Gertz,* 199 Md. App. at 430. We must view "the evidence and all inferences drawn therefrom . . . in the

48

light most favorable to . . . the prevailing party" and decide whether the evidence "is sufficient to support the court's finding of willfulness." *Id.*

Before addressing the court's specific factual findings, we address what constitutes willful conduct permitting a finding of contempt. "[W]illful conduct is action that is '[v]oluntary and intentional, but not necessarily malicious.'" *Id*. at 430 (quoting *Royal Inv. Group, LLC v. Wang*, 183 Md. App. 406, 451 (2008)). A contempt finding requires a showing that the inability to comply with a court order "arose 'from a deliberate effort or a wilful act of commission or omission by the alleged contemnor committed with the knowledge that it would frustrate the order of the court.'" *Dorsey v. State*, 356 Md. 324, 354 (1999) (quoting *In re Ann M.*, 309 Md. 564, 569 (1987)). Although evidence of a defendant's conduct that purposefully renders the defendant unable to comply may give rise to an inference that the defendant acted willfully and with knowledge, the *mens rea* of contempt "must be established by evidence, and cannot simply be 'assumed.'" *Id.* at 352 ("purported judicial notice" that defendant "could 'probably make $240 a week while working at one of the fast food places'" was insufficient to support inference of willfulness).

With that background in mind, we turn to the court's specific findings. We begin with the court's statement that the Department does not use 10 days as the criterion for admission, but instead, it bases admission on a patient's acuity, which is not authorized by the statute. There clearly was testimony that acuity was a factor in prioritizing admissions. As the circuit court recognized, however, prioritization of the most acute and actively

49

symptomatic patients for immediate treatment is a valid consideration in the Department's admission process.[32]

There was no evidence, however, that the Department's acuity evaluations created or were responsible for the existing waitlist to admit patients. Instead, the testimony was that a combination of several factors caused the inability to admit patients within the 10-day period, including a large increase in commitment orders from 2021 to 2022, a nationwide staffing crisis affecting both inpatient hospital facilities and step-down community care, an increase in undocumented patients, and on-going COVID-19 outbreaks.[33] Although the court cited testimony that "other people may have come ahead [of Mr. Myers]," there was no testimony that a clinical override prevented compliance with the order. The evidence in the record shows that the Department used acuity checks to *manage* an existing waitlist, ensuring that the sickest patients were prioritized for admission; there was no testimony that the acuity checks *caused* the waitlist.

With respect to the court's finding that the Department could have placed patients ready for discharge "somewhere," such as in a hotel, that finding is not supported by the record. The patients involved here had been found to be mentally ill and dangerous, and Mr. Chaudry stated that, even if there was a hotel available to place patients ready for

---

[32] The court explained that it was not saying that "the methods that [the Department] use[s] to prioritize people aren't valid."

[33] There was testimony that the Department consistently met the 10-day standard prior to the start of the COVID-19 pandemic.

discharge, the Department would not have staff and security to be able to do that, noting the nationwide clinical staffing shortage.

Finally, the court found that "the only thing holding [the Department] back were things that you could have controlled with money," and "there are ways to get money." That finding is not supported by the record. There was no testimony that emergency funding was immediately available to the Department. Rather than a finding based on evidence, the Court's statement that the Department had ways to get money was an assumption, which is not sufficient to support a finding of willfulness. *See Dorsey*, 356 Md. at 352.

We do understand the court's frustration with the recurring problem arising from the Department's failure to admit defendants committed to its care. The court in this case, however, did not have evidence to support a finding that the Department's failure to admit Mr. Myers within ten days of the court's order was willful. There was no evidence that the Department had a bed available for appellee or that the failure to admit Mr. Myers to a psychiatric facility was deliberate and willful. Because the record does not support the finding that the Department willfully failed to comply with the order, the court's finding in this regard was clearly erroneous, and the court abused its discretion in finding the Department in contempt.

Additionally, as this Court has explained:

[A]n order holding a person in constructive civil contempt is not valid unless it: (1) imposes a sanction; (2) includes a purge provision that gives the contemnor the opportunity to avoid the sanction by taking a definite, specific action of which the contemnor is reasonably capable; and (3) is designed to

51

coerce the contemnor's future compliance with a valid legal requirement rather than to punish the contemnor for past, completed conduct.

*Breona C. v. Rodney D.*, 253 Md. App. 67, 74 (2021).

Here, although there was a sanction imposed based on the Department's violation of CP § 3-106(c)(4), there was no sanction or purge provision included for the finding of contempt. Accordingly, the court erred or abused its discretion in its order holding the Department in constructive civil contempt.

## 2.

### December 29, 2022 and January 5, 2023 Hearings: Mr. Murphy

At the beginning of the contempt hearing related to Mr. Murphy, the court stated that it had read the pleadings and was "beyond frustrated with the department of health," explaining that it was not acceptable to "just say, we don't have room at the inn." After hearing the evidence, the court found that the Department willfully violated the statute because: (1) it had not taken adequate steps to add additional beds, as it did in response to a previous crisis in 2017; (2) there was no evidence that COVID or staffing shortages impacted admissions; (3) the Department considered the 10-day requirement as aspirational; (4) only two undocumented patients had been transferred to WMHC; and (5) the Department had the option, but failed to seek, emergency legislation for new facilities and staffing and to expedite the certification process.

With respect to additional beds, the court found that the Department's "inability to comply [wa]s of [its] own making" because it did not prepare for the ongoing effects of the COVID-19 pandemic, noting that, when faced with a similar crisis in 2017, the Department

was able to add 120 beds within a year.  It also noted that, in 2021, the Department added 43 beds.  The court found that the only steps taken to address the present crisis were policy decisions and the creation of an emergency task force, and these actions were insufficient.

The evidence, however, shows that the Department did more than that.  Indeed, although the court initially stated that it had not "heard of the Department doing really anything in the last year and a half," the court then backtracked and acknowledged that, in 2022, the Department added 40 beds to address the backlog of patients that needed to be discharged.  Moreover, to address the lack of community step-down beds and the significant increase in undocumented patients needing more resources to be discharged, a big reason for the backlog in patients, the Department presented evidence that it hired an immigration attorney, created a pilot program to discharge patients to the WMHC, coordinated with the judiciary regularly to expedite required hearings for discharge, increased staffing to handle complicated benefits documentation, and was in the process of requesting additional funding for inpatient and step-down beds.

The evidence also demonstrated that the Department faced an unprecedented increase in commitment orders, an increase in undocumented patients, and staffing shortages contributing to the delay in admitting new patients, in addition to on-going COVID outbreaks.  These challenges either did not exist or were far less pronounced in 2017 when the Department faced a similar crisis.[34]

---

[34] Although the court commented on the Judiciary's response to COVID, we note that reconfiguring a courthouse to accommodate for COVID restrictions is different from providing treatment for patients committed to the Department, who have been determined

53

The court's finding that there was no evidence that COVID or staffing shortages impacted admissions was inconsistent with the record evidence. The court stated that "[it] did not hear that [COVID] has prevented people from entering [facilities]," but the Secretary testified that, at the time of the hearing, Perkins had a COVID outbreak and "admissions rates . . . have slowed because we are in COVID protocols." He further testified that, although admissions do not stop due to COVID, "flexibility . . . is limited by the COVID outbreak." Ms. Fleming also testified regarding the impacts of COVID, noting that outbreaks "limit the number of patients we can move either in the hospital or within the hospital," impact community step-down units, where "[a] number of beds have been turned offline due to COVID," and prevent receipt and transfer of patients. With regard to Perkins, where Mr. Murphy needed to be housed, Ms. Fleming testified that an outbreak of COVID began at the beginning of December. She testified how that affected admissions, as follows:

> It slows admissions. And the reason it slows, it depends on where the outbreak is in the hospital. And this is true for any of our hospitals. If it is on the admission unit, that prohibits us from bringing in more people on those units.

> If the outbreak is on continued care, then we a have challenge moving folks from admissions over to continued care to free up the admissions beds. So it slows our ability to move patients throughout our hospital. And that did occur at Perkins as well.

Ms. Fleming testified that the county health department determines when the hospital is no longer on outbreak status, and "[o]nce the COVID level hits a certain number, they will

---

to be dangerous and need specialized care, medication, and secured facilities with trained and licensed staff.

54

take us off outbreak status for that facility." Ms. Fleming believed that Perkins still was on outbreak status, but it was anticipated to come off that day or the next day.

Regarding staffing, the Secretary stated that 40,000 clinicians had left the profession, and "it is having a draconian effect on the ability of our capacity to maintain pace," not just in the hospitals, but also in the community step-down units. Mr. Chaudry testified that the Department was only able to maintain its operations and census through overtime pay due to staffing shortages. He also testified that staffing shortages limited the Department's ability to move patients ready for discharge to the WMHC, and therefore, it limited the ability of the hospitals to accept additional patients. Contrary to the court's finding, the Department did provide a "specific explanation as to how [the staffing shortage] has impacted [the] state-run mental health facilities."

The record also does not support the court's determination that the Department considers the 10-day requirement as an "aspiration or target" that it does not have to follow, and "they are creating their own law" by creating a "30 to 35 business-day goal" for admissions. Although the Secretary used the term "target" when explaining negotiations with the legislature in 2018 regarding statutory amendments to impose a 10-day deadline for admission of patients deemed IST, he acknowledged that the 10-day deadline was a mandate:

THE COURT: The 10 days is not a target. It is mandated.

THE WITNESS: Yes, that is correct. We understand. We agree.

THE COURT: Okay. You called it a target.

55

THE WITNESS: Yes, sir. We agree. But I am saying we met that mandated limit for two years, so we had the capacity to – for two years. It wasn't like it was just a couple days or a month or two. Two steady years of compliance with the mandate.

Ms. Fleming also testified that the statute mandated admission within 10 days.

With regard to transferring undocumented patients to WMHC, the court noted that only two people had been moved, but the evidence demonstrated that the transfer of eight additional patients was pending and that transfer of all the undocumented patients was not possible at that time due to licensing and staffing issues. Specifically, Mr. Chaudry testified that, although WMHC had the capacity for more than 100 patients, it was not yet fully licensed for that number:

THE WITNESS: The Secretary may have been talking about the physical space there.

THE COURT: That is what I mean.

THE WITNESS: Yes. Not actual licenses. That is a separate and distinct distinction there where we've had a budget or a license capacity versus actual physical capacity. And we're actually looking at both, Your Honor. What we can do at both.

Mr. Chaudry also explained the danger of discharging patients to "inappropriate settings" because of the risk of deterioration, instability and recidivism. He stated that discharge plans must be appropriate in order to succeed in a lower level of care.

Finally, there was no testimony or evidence presented that the Department had "the option of seeking emergency funding" or legislation. To the contrary, the testimony was as follows:

[MR. CHAUDRY]: The federal funding associated with COVID-19 has very – there are very specific and direct requirements for what it can and cannot be

56

applied to. And we cannot utilize COVID funds for non-COVID purposes. So you can use it for COVID mitigation. You can use it for PPE. You can use it for various things but you cannot utilize it to, as an example, open a new psychiatric unit or staff a new unit or do anything of that nature.

[COUNSEL FOR THE DEPARTMENT]: So given that you were in charge of that as well, the funds that the court likely utilized to be able to continue with jury trials, that is not something that could just be turned around and applied to the hospitals.

[MR. CHAUDRY]: No it cannot.

Mr. Chaudry also testified that various budget and legislative requests were pending, but they were protected by executive privilege. The court's statement that it didn't "completely understand this executive privilege that relates to seeking assistance . . . from the legislature" and its speculative assertion that the Department "had the option of seeking emergency legislation" do not support a finding of willful conduct.

In *Gertz,* relied on by the appellees, we held that willfulness may be shown when a defendant purposefully renders himself unable to comply and engages in a deliberate strategy of delay. 199 Md. App at 431–32. In that case, we concluded that the court properly drew an inference of willfulness in the defendant's failure to perform required environmental remediation because he only "occasionally stopped by [the] engineer's office" hired to obtain the required permits, but he did nothing more in the over three-year period after the court order. *Id.* at 433. The court thus found that he "deliberately dragged his feet in submitting" the required plans and put off compliance with the order. *Id.*

In contrast, here, the evidence was that the Department treated its inability to place patients as an emergency, exploring all options available to remedy the problem. Even if the court did not credit the testimony adduced by the Department, there was no *evidence*

57

that the Department was deliberately dragging its feet in trying to admit Mr. Murphy or any of the committed individuals.

In sum, although we understand the court's frustration with the Department's violation of the 10-day statutory deadline, the record does not support the finding that the Department's conduct was willful. Accordingly, the court's finding in this regard was clearly erroneous, and the court abused its discretion in holding the Department in contempt for its failure to admit Mr. Murphy to a psychiatric facility within 10 days of the commitment order.[35]

## II.

### STATUTORY SANCTIONS

Although we have concluded that the circuit court erroneously found the Department in contempt in Mr. Myers' and Mr. Murphy's cases, that is not the end of the inquiry. As indicated, in 2018, the General Assembly amended CP § 3-106 to provide that a court can impose statutorily authorized sanctions if the Department fails to admit a

---

[35] Moreover, as indicated, an order holding a person in constructive civil contempt is valid only if it includes a purge provision. Here, the court stated that the Department could purge the contempt by paying $2,000 per day to the Anne Arundel County government. The court subsequently "waive[d] [the] $2,000 per day purge" because it found that the Department had complied with the order and purged the contempt. We note that, for an order holding a person in constructive civil contempt to be valid, the sanction imposed must be distinct from the purge provision and permit the defendant to avoid the penalty by taking specific action within the defendant's control. *Breona C.*, 253 Md. App. at 74. Here, although not phrased that way, it appears that the court intended to impose a sanction of $2,000 per day that could be purged by admitting Mr. Murphy to a Department facility, which the Department did, and the court then found that the Department had purged the contempt.

defendant to a designated health care facility within 10 business days after the Department receives the commitment order. CP § 3-106(c)(2)(a). The failure to timely admit a defendant is the critical question under the statute; a finding of willfulness that is needed for contempt is not required to impose statutorily authorized sanctions.[36]

Here, in all 14 consolidated cases, the court imposed sanctions under CP § 3-106(c)(4). Thus, we must, as an additional matter, address the propriety of the sanctions imposed pursuant to the statute.

CP § 3-106(c)(4) provides that, once there is a violation of the 10-day requirement for placing a defendant in a facility, "the court may impose any sanction reasonably designed to compel compliance, including requiring the Health Department to reimburse a detention facility for expenses and costs incurred in retaining the defendant beyond the [10-day] time period . . . at the daily rate specified in § 9-402(b) of Correctional Services Article." The daily rate specified in Section 9-402(b) of the Correctional Services Article

_____

[36] In reviewing the legislative history for CP § 3-106(c)(2)(i), we note that the first drafts of both House Bill 111 and Senate Bill 233 included a provision for a "[r]ebuttable presumption of contempt . . . if a defendant who has been committed [to the Department] is not placed in a designated health care facility on or before the date specified by the court in a commitment order." H.B. 111, 2018 Leg., 438th Sess. (Jan. 15, 2018); S.B. 233, 2018 Leg., 438th Sess. (Jan. 19, 2018). The first draft specifically stated that the court could impose, in addition to sanctions in a contempt case, "any sanction reasonably designed to compel compliance." *Id.* Although these provisions related to contempt were removed before the final legislation was enacted, it is clear that the allowable statutory sanctions were separate from contempt findings. *Id.*

is "at least $45" per day. Md. Ann. Code, Correctional Services Article ("CSA") § 9-402(b) (2017 Repl. Vol.).[37]

The Department contends that the court erred in imposing sanctions under CP § 3-106(c)(4) because: (1) there was no evidence that the sanctions were "reasonably designed to compel compliance"; and (2) the sanctions "greatly exceeded the amount of fines allowable by law." It asserts that there was no evidence supporting the rates of reimbursement imposed, and the Department did not have an opportunity to refute the rates.

Appellees contend that the sanctions were permitted by the statute, which authorizes sanctions to reimburse a detention facility for costs incurred in retaining a defendant beyond the 10-day period for admission to a health care facility at the rate of "*at least* $45 per day." They assert that the statute does not limit the court to the imposition of sanctions based on reimbursement of the detention facility, and the court "was under no obligation" to credit the testimony of the Department witnesses who stated that sanctions would not induce compliance.

In assessing whether the court properly imposed sanctions, we note the different applicable standards of review. An evidentiary finding made under a statute authorizing sanctions is reviewed under a clearly erroneous standard. *See, e.g., Zdravkovich v. Bell*

---

[37] Md. Ann. Code, Correctional Services Article ("CSA") § 9-402(b) (2017 Repl. Vol.) provides:

> Subject to subsection (d) of this section, for each fiscal year the State shall provide each county a grant equal to at least $45 for each day from the end of the 12th month through the end of the 18th month that a sentenced inmate was confined in a local correctional facility during the second preceding fiscal year.

60

*Atl-Tricon Leasing, Corp.,* 323 Md. 200, 210–11 (1991). Whether to award sanctions, and the amount of sanctions awarded, is reviewed for an abuse of discretion. *Garcia v. Foulger Pratt Dev., Inc.*, 155 Md. App. 634, 676–77 (2003). Questions of statutory interpretation, however, are reviewed *de novo. Elsberry v. Stanley Martin Cos. LLC*, 482 Md. 159, 178 (2022).

With respect to statutory interpretation, we apply well-settled principles of statutory construction. "Our goal in statutory construction is to determine legislative intent." *State v. Krikstan*, 483 Md. 43, 65 (2023). We look first at the words used by the legislature and give them their ordinary meaning. *In re Abhiskek*, 255 Md. App. 464, 472 (2022) (citing *Howling v. State*, 478 Md. 472, 498 (2022)). Because "[w]e presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law . . . we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Id.* (quoting *Gerety v. State*, 249 Md. App. 484, 498 (2021)). "If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to the legislative intent ends ordinarily and we apply the statute as written without resort to other rules of construction." *Id.* (quoting *White v. State*, 250 Md. App. 604, 638 (2021)).

As indicated, CP § 3-106(c)(4) provides that, when the Department fails to admit a defendant within 10 days of a commitment order, "the court may impose any sanction reasonably designed to compel compliance." Such a sanction may include "requiring the Health Department to reimburse a detention facility for expenses and costs incurred in retaining the defendant beyond the [10-day] time period . . . at the daily rate specified in §

61

9-402(b) of the Correctional Services Article." CP § 3-106(c)(4). We turn now to the specific sanctions imposed in each of the consolidated cases.

**1.**

**State v. Myers**

In *Myers,* the Department was ordered to pay $1,000 per day from December 16, 2022, the date of the hearing, until the date Mr. Myers was admitted to a Department facility, which the Department asserts "amounted to $20,000 for the 20 days until he was admitted on January 5, 2023."[38] The Department contends that the court erred in imposing these sanctions under the statute because Ms. Fleming and Mr. Chaudry testified that no amount of sanctions would induce compliance because there were "no beds." The court, however, was not obligated to believe that testimony and had significant discretion "to accept – or reject – *all, part, or none* of the testimony of [the] witness." *Goicochea v. Goicochea*, 256 Md. App. 329, 349 (2022), *cert. denied*, 483 Md. 277 (2023) (quoting *Omayaka v. Omayaka*, 417 Md. 643, 659 (2011)). On review, we give "due regard" to the court's opportunity to assess the credibility of the witnesses. *Id.* at 340.

---

[38] In imposing the sanctions, the court stated:

> Now, in addition to [the finding of contempt], it is a violation to [sic] the statute I just cited. The statute provides that the Court can come up with other things than just payment to the Detention Center in order to compel compliance. The indication was it costs $600 a day at your facility. So the $45 at the detention center is really not a motivation. So the sanction of the Court will be $1,000 a day and to compel you to place Mr. Myers and it will continue until he's place[d].

Although we have concluded that there was no evidence to support a finding that the Department's failure to admit Mr. Myers to a Department facility within 10 days of the commitment order was willful, CP § 3-106(c)(4) permits sanctions based on a mere failure to comply with the 10-day deadline, if the sanctions are "reasonably designed to compel compliance." We cannot conclude that the court erred or abused its discretion in finding that a sanction of $1,000 a day satisfied that standard.

## 2.

### State v. Murphy

In *Murphy*, the court issued two separate sanctions. As indicated, the court issued a sanction of $2,000 per day based on the finding of contempt, but it subsequently waived that sanction after the Department complied with the purge provision to place Mr. Murphy in a facility. The Department, therefore, does not challenge this order.

The Department does challenge the separate sanction pursuant to CP § 3-106(c)(4). In that regard, the court stated:

> I am also going to order separately as a sanction that they reimburse the Anne Arundel County Detention Center. My understanding of the going cost at Jennifer Road to house someone is $205.82. It has been 31 days. And I took November 21st, I added 10 business days. On the 11th business day I started my calculations. From the 11th business day after November 21st through today has been 31 days. At $205.82 day, that totals $6,380.42. That is due from the state of Maryland Department of Health to the Anne Arundel County government, who oversees -- that is a direct requirement to reimburse them for the cost associated with housing someone at the Anne Arundel County Detention Center. That will be ongoing, so as of today it is $6,380.42. It will continue to accumulate at the rate of $205.82 per day.

The Department contends, as it did in the *Myers* case, that this sanction was erroneous because it would not compel compliance since no beds were available. For the

63

reasons previously stated, the court did not err or abuse its discretion in concluding that monetary fines were "reasonably designed to compel compliance."

The Department also contends that the sanction was erroneous because the rate of reimbursement exceeded the amount of the fine allowable by the statute and there was no evidence to support a fine of $205.82 a day. With respect to the first contention, that the sanction exceeded the amount of the fine allowable, we agree with appellees that it is without merit. CP § 3-106 and CSA § 9-402(b) provide that a court may impose "*any* sanction reasonably designed to compel compliance, *including*" reimbursement to a detention facility at a rate of "*at least* $45" per day. (Emphasis added.) Thus, the statute does not place a limit on the sanction that can be imposed, as long as it is reasonably designed to compel compliance.[39]

Here, however, the court said the sanction was to reimburse the detention center for the cost to house Mr. Murphy. Reimbursement of $205.82 per day, therefore, was permitted by the statute if there was evidence that this was the amount needed to reimburse the detention center for expenses and costs in detaining Mr. Murphy beyond the time he should have been admitted to a Department facility. There was no such evidence here. Although the court stated that its "understanding of the going [daily] cost at Jennifer Road to house someone is $205.82," there was no evidence in the record to support that

---

[39] There may be other limits on the sanction that can be imposed but that question is not presented here.

statement.[40]  We therefore vacate this sanction and remand to the circuit court for further proceedings.

**3.**

**Baltimore City Orders Imposing Sanctions**

With regard to the 12 Baltimore City cases, the Department contends that the court erred in imposing sanctions pursuant to CP § 3-106(c)(4) because the sanctions were imposed without notice, a hearing, or due process.  The Department alleges that it was unaware of any petition filed requesting sanctions, and the court did not provide the Department with any notice or opportunity to be heard prior to issuing the orders.

Appellees contend that the court complied with CP § 3-106(c)(4) when it ordered the Department to reimburse the DPSCS for expenses and costs related to the Department's failure to admit the Baltimore City Defendants within 10 business days of the commitment orders.  They assert that the Department had notice of the deadlines in the commitment orders and express notice of the provision in CP § 3-106(c)(4) authorizing the court to order reimbursement to a detention facility if the Department did not comply with the 10-day timeframe.  Appellees argue that, even if the Department was denied due process, the cases should be remanded for further proceedings under Rule 8-604(d).

We agree with the Department that procedural due process guarantees apply to the imposition of sanctions under CP § 3-106(c)(4).  *See City Homes, Inc. v. Hazelwood,* 210

---

[40] The 2018 Fiscal and Policy Note, First Reader, to Senate Bill 233 notes that "per diem operating costs of local detention facilities have ranged from approximately $40 to $170 per inmate in recent years."  Dep't Leg. Servs., Fiscal and Policy Note, First Reader, S.B. 233, at 6, 2018 Leg., 438th Sess. (Md. 2018).

Md. App. 615, 694 (court abused its discretion in imposing sanctions that were never requested and without first providing notice to the sanctioned party), *cert. denied*, 432 Md. 468 (2013). "It is pellucid that sanctions may not be imposed against a party without notice." *Id.* "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 693–94 (quoting *Griffin v. Bierman*, 403 Md. 186, 197 (2008)). Thus, at its core, "due process is the right to notice and a meaningful opportunity to be heard." *Roberts v. Total Health Care, Inc.*, 349 Md. 499, 509 (1998) (quoting *LaChance v. Erickson*, 522 U.S. 262, 266 (1998)).

"The question of whether a party is deprived of the right to due process involves an issue of law and not of fact." *Regan v. Bd. of Chiropractic Exam'rs*, 120 Md. App. 494, 509 (1998), *aff'd*, 355 Md. 397 (1999). "As such, the standard of review applied by an appellate court is *de novo*." *Id.*

Here, it appears that the court imposed sanctions against the Department *sua sponte*, without any request being filed. There is no evidence in the record that the Department received any notice of the court's intent to impose sanctions or that the Department was provided with an opportunity to be heard regarding the propriety or amount of the sanctions prior to issuance of the orders. Indeed, appellees concede this point. Because the court violated the Department's due process right by imposing sanctions under CP § 3-106(c)(4) without notice, we reverse the judgments of the Circuit Court for Baltimore City.

## III.

## Conclusion

In a situation where the court finds an individual to be IST and dangerous and commits the individual to the Department with an order to admit the defendant to a designated health facility within 10 business days, and the Department does not admit the defendant to a Department facility within that time period, there are two ways to attempt to compel compliance. First, a party can file an action for constructive civil contempt. Second, a party can file an action for statutory sanctions under CP § 3-106(c)(4).

Constructive civil contempt requires a finding, based on evidence, of a willful failure to comply with the court's commitment order. *Crawford*, 239 Md. App. at 109–12. In addition, an order holding an individual in constructive civil contempt is valid only if it:

> (1) imposes a sanction; (2) includes a purge provision that gives the contemnor the opportunity to avoid the sanction by taking a definite, specific action of which the contemnor is reasonably capable; and (3) is designed to coerce the contemnor's future compliance with a valid legal requirement rather than to punish the contemnor for past, completed conduct.

*Breona C.*, 253 Md. App. at 74–75. Because the Anne Arundel County orders of contempt involving Mr. Murphy and Mr. Myers were not valid, they shall be reversed.

In addition to a contempt finding, a court can impose sanctions pursuant to CP § 3-106. To find a violation of CP § 3-106(c)(2) and impose sanctions under CP § 3-106(c)(4), the court needs to find only that the Department failed to admit an individual deemed IST and dangerous to a designated health facility within the statutorily required 10-day period. A finding that the Department acted willfully or had the present ability to comply with the commitment order is not required. If the court finds a failure to timely admit a defendant,

67

the statute provides for the imposition of sanctions "reasonably designed to compel compliance." For the reasons set forth, *supra*, we uphold the statutory sanctions imposed in Mr. Myers' case, and we vacate the sanctions in Mr. Murphy's case and remand for further proceedings.

In either a contempt or statutory enforcement action, the Department must be given notice of the claim and an opportunity to be heard before a court may impose sanctions for failure to timely place a defendant in a Department facility. Because the orders in the 12 Baltimore City cases violated the Department's due process rights to notice and the right to be heard, we reverse the judgments in those cases.

**JUDGMENTS OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED IN PART, AFFIRMED IN PART, AND VACATED IN PART. JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. COSTS TO BE PAID BY APPELLANT.**